IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 10 2015

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

| | |
|---|---|
| BONITA IVERSON<br>and APRIL EANS,<br>       Plaintiffs,<br><br>v.<br><br>HOUSING AUTHORITY OF<br>THE CITY OF LITTLE ROCK,<br>d/b/a METROPOLITAN<br>HOUSING ALLIANCE; and<br>RODNEY FORTE, individually<br>and in his official capacity,<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 4:15cv694-KGB

This case assigned to District Judge Baker
and to Magistrate Judge Kay

**JURY TRIAL DEMANDED**

---

## COMPLAINT

Plaintiffs Bonita Iverson and April Eans (collectively "Plaintiffs") bring this Complaint against the Housing Authority of the City of Little Rock, d/b/a Metropolitan Housing Alliance, and Rodney Forte, in his individual capacity as well as his official capacity as Executive Director of MHA (collectively "Defendants").

Plaintiffs seek declaratory and injunctive relief under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Fair Housing Amendments Act. Additionally, Plaintiffs seek compensatory and

punitive damages under 42 U.S.C. § 1983; Arkansas's Civil Rights Act; and tort claims of negligence and breach of the implied warranty of habitability.

## INTRODUCTION

1. Plaintiffs in this action are a current public-housing tenant and a former public-housing tenant who was constructively evicted, both of whom suffer from asthma, and they bring this action:

   a. To compel MHA to make reasonable accommodations and modifications in its policies and procedures to effective abate mold and moisture in certain public-housing apartments;

   b. To compel MHA to make reasonable accommodations and modifications in its policies and procedures to effectively repair and maintain the elevators in certain public-housing apartment;

   c. For damages suffered as a result of Defendants' violation of 42 U.S.C. § 1983, Defendants' violation Arkansas's Civil Rights Act, Defendants' breach of the implied warranty of habitability, and Defendants' negligence.

## PARTIES, JURISDICTION, & VENUE

2. Plaintiff Bonita Iverson is a recipient of federal funding for public housing. Through her public-housing funds, she is a resident of Jesse Powell Towers, 1010 Wolfe St., Little Rock, AR 72202 ("the Apartments"), and she has been a resident of the Apartments at all times relevant to the claims asserted in this Complaint.

3. Plaintiff April Eans is a former recipient of public-housing funds and a former resident of the Apartments. Ms. Eans resided at the Apartments at all times relevant to the claims asserted in this Complaint, until she was constructively evicted by an agent or representative of Defendants.

4. Both Plaintiffs are diagnosed asthmatics. Additionally, Plaintiff Eans has a diagnosis of cerebral palsy.

5. Defendant Housing Authority of the City of Little Rock, d/b/a Metropolitan Housing Alliance ("MHA"), is a local Public Housing Agency responsible for the administration or public-housing funding programs in Little Rock, AR.

6. Defendant Rodney Forte is the Executive Director of MHA and is responsible for the day-to-day oversight and management of the public-housing programs administered by MHA.

7. Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331, 1343(3)-(4), because Plaintiffs assert civil-rights claims against Defendants under federal law, specifically the Americans with Disabilities Act of 1990 ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Fair Housing Amendments Act of 1988 ("FHAA"), and 42 U.S.C. § 1983.

8. This Court has jurisdiction over the state-law claims asserted herein pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367, as the state-law claims are substantially related to the original federal-law claims.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant MHA resides in this judicial district, and pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this district. Plaintiff Iverson resides in public housing in this judicial district, while Plaintiff Eans resided in public housing in this

district until she was constructively evicted. Upon information and belief, Defendant Forte resides in this judicial district as well.

10. This action is timely under the ADA, Section 504, and 42 U.S.C. § 1983 because it was filed within three years of the violation of each of those statutes.

11. This action is timely under the FHAA, 42 U.S.C. § 3613(a)(1)(A), because it was filed within two years of the occurrence of a discriminatory housing practice.

12. This action is timely under the Arkansas Civil Rights Act because suit was filed within three years of the alleged violation of that statute.

13. This action is timely as to state-law tort claims because suit was filed within three years of the occurrence of each tortious act.

## STATUTORY AND REGULATORY FRAMEWORK

### Americans with Disabilities Act

14. Congress passed the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

15. Title II of the ADA prohibits public entities, defined to include state and local governments and their departments, agencies, and instrumentalities—from excluding qualified individuals with disabilities from participation in, or denying them the benefits of, the services, programs, or activities of the public entity. *See* 42 U.S.C. §§ 12131(1)(A)-(B), 12132; 28 C.F.R. §§ 35.104, 35.130(a).

16. Regulations implementing Title II of the ADA provide, in pertinent part:

> A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability [...]
>
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is equal to that afforded others;
>
> (iii) Provided a qualified individual with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; [...]
>
> (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by other receiving the aid, benefit, or service.
>
> 28 C.F.R. § 35.130(b)(1).

17. Regulations promulgated by the U.S. Department of Justice to implement Title II of the ADA provide that a "public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (1) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3).

18. Regulations implementing Title II of the ADA further provide that a "public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

19. The ADA protects "qualified individual[s] with a disability," who are defined as "an individual with a disability who, with or without reasonable modification to rules, policies, or practices,...meets the

essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

20. Under the ADA, "disability" is defined in pertinent part as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 35.104.

21. Under the ADA, "physical or mental impairment" specifically includes "[a]ny physiological disorder or condition... affecting... [the] respiratory [system]." 28 C.F.R. § 35.104(1)(i)(A).

22. The ADA also specifically lists cerebral palsy as a "physical or mental impairment." 28 C.F.R. § 35.104(1)(ii).

23. "Major life activities" are defined in the regulations implementing Title II of the ADA as including breathing, working, sleeping, concentrating, and the operation of major bodily systems (including the respiratory system). 42 U.S.C. § 12102(2)(A)-(B); *see also* 28 C.F.R. § 35.104.

Section 504 of the Rehabilitation Act

24. Section 504 prohibits programs and activities receiving federal financial assistance from excluding otherwise qualified individuals

with disabilities from participation in those programs or activities, or denying them the benefits of those programs or activities, or otherwise subjecting them to discrimination in those programs and activities solely by reason of disability. 29 U.S.C. § 794(a).

25. Section 504 requires the head of each Executive agency to promulgate regulations to carry out the Act. 29 U.S.C. § 794(a).

26. The Department of Housing and Urban Development ("HUD") has promulgated regulations implementing Section 504 that apply to recipients of federal financial assistance from HUD. *See* 24 C.F.R., pt. 8.

27. HUD regulations implementing Section 504 provide, in pertinent part:

> A recipient, in providing any housing, aid, benefit, or service in a program or activity that receives Federal financial assistance from [HUD] may not, directly or through contractual, licensing, or other arrangements, solely on the basis of handicap: [...]

> (ii) Afford a qualified individual with handicaps an opportunity to participate in, or benefit from, the housing, aid, benefit, or service that is not equal to that afforded to others;
> (iii) Provide a qualified individual with handicaps with any housing, aid, benefit or service that is not as effective in affording the individual an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; [...]

(viii) Otherwise limit a qualified individual with handicaps in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by other qualified individuals receiving the housing, aid, benefit, or service.

24 C.F.R. § 8.4(b)(1).

28. HUD regulations implementing Section 504 provide that, "[f]or purposes of this part, housing, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for individuals with handicaps and non-handicapped persons, but must afford individuals with handicaps equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement." 24 C.F.R. § 8.4(b)(2).

29. HUD regulations implementing Section 504 provide that recipients of federal financial assistance from HUD must not, "directly or through contractual or other arrangements, utilize criteria or methods of administration the purpose or effect of which would: (i) Subject qualified individuals with handicaps to discrimination solely on the basis of handicap; [or] (ii) Defeat or substantially impair the accomplishment of the objectives or the

recipient's federally assisted program or activity for qualified individuals with a particular handicap involved in the program or activity, unless the recipient can demonstrate that the criteria or methods of administration are manifestly related to the accomplishment of an objective of a program  or activity." 24 C.F.R. § 8.4(b)(4).

30. Section 504 protects "qualified individual[s] with handicaps," who are defined as "individual[s] with handicaps who meet[] the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity." 24 C.F.R. § 8.3; *see also* 29 U.S.C. § 794(a) (using the term "otherwise qualified individual with a disability").

31. Under Section 504, "individual with a disability" is defined, in pertinent part, as an individual with a physical or mental impairment that substantially limits one or more major life activities. *See* 29 U.S.C. § 705(20)(B) (defining "individual with a disability" as "any person who has a disability as defined in section 12102 of Title 42); *see also* 24 C.F.R. § 8.3.

32. "Major life activities," as defined in Section 504, include breathing, working, sleeping, concentrating, and the operation of major bodily systems. 29 U.S.C. § 705(20)(B) (incorporating the definition of "disability" in 42 U.S.C. § 12102(2)(A)-(B)); *see also* 24 C.F.R. § 8.3 (defining "major life activities" to include breathing, taking care of oneself, and working).

<u>Fair Housing Amendments Act</u>

33. The FHAA provides that "it shall be unlawful...[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of...that buyer or renter [or] a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." 42 U.S.C. § 3604(f)(1); *accord* 24 C.F.R. § 100.202(a).

34. The FHAA provides that "it shall be unlawful...[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of...that person [or] a person residing in or intending to reside in that

dwelling after it is so sold, rented, or made available." 42 U.S.C. § 3604(f)(2); *accord* 24 C.F.R. § 100.202(b).

35. "Discrimination" is defined in the FHAA to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); *accord* 24 C.F.R. § 100.204(a).

36. "Handicap" is defined under the FHAA, in pertinent part, as "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h); *accord* 24 C.F.R. 100.201.

37. "Physical or mental impairment" is defined to include any physiological disorder or condition of the respiratory system. *See* 24 C.F.R. § 100.201(a)(1).

38. "Physical or mental impairment" under the FHAA specifically includes, *inter alia*, cerebral palsy. *See* 24 C.F.R. § 100.201(a)(2).

39. "Major life activities" are defined under the FHAA as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working." 24 C.F.R. § 100.201(b).

## HUD Standards

40. HUD has promulgated minimum standards that all public-housing structures are required to meet.

41. These minimum standards include a blanket requirement that "HUD housing must be decent, safe, sanitary and in good repair" (hereinafter "DSS/GR"). 24 CFR § 5.703.

42. To qualify as DSS/GR, a public-housing unit must, *inter alia*, "be structurally sound, habitable, and in good repair." *Id.*, at § 5.703(d)(1). More explicitly, "All areas and aspects of the dwelling unit...must be free of health and safety hazards." *Id.*

43. "All areas and components of the housing must be free of health and safety hazards[, including, but] not limited to, air quality [and] elevators. *Id.*, at § 5.703(f). "The dwelling units and common areas must have proper ventilation and be free of mold." *Id.*

## 42 U.S.C. § 1983

44. Congress enacted 42 U.S.C. 1983 to create "a 'species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 304-06 (1986).

45. Additionally, under 42 U.S.C. 1983, "as the language of the statute plainly indicates, the remedy encompasses violations of federal statutory as well as constitutional rights" and "the coverage of [Section 1983] must be broadly construed." *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 105-06 (1989). The statute provides a remedy "against all forms of official violation of federally protected rights." *Id.* at 106 (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 700-01 (1978)).

46. In deciding whether a federal right has been violated, courts have looked at "whether the provision in question creates obligations binding on the governmental unit or rather 'does no more than express a congressional preference for certain kinds of treatment.'" *Id.*

47. One requirement of receiving HUD funds is that the housing authority "must maintain such housing in a manner that meets the physical condition standards set forth in this section in order to be considered decent, safe, sanitary and in good repair." 24 C.F.R. § 5.703.

48. Specifically, to be considered DSS/GR, a housing unit and common areas of the unit "must have proper ventilation and be free of mold, odor (e.g., propane, natural gas, methane gas), or other observable deficiencies." 24 C.F.R. § 5.703(f).

49. Where a state agrees to provide a certain quality of service to a certain group of people as a condition upon receiving federal funding, the United States Supreme Court has found that the receipt of those federal funds under such conditions confers a right on the class of people that the statute was designed to benefit. *See, e.g.*, *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) (holding that requiring a school district to reimburse a disabled student for the cost of private school, even where the disabled student did not first attend the public school, was proper because the reimbursement was merely requiring the district to provide the free, adequate public education that it was required to provide in the first place).

50. Arkansas law specifically provides that a housing authority may "[b]orrow money or accept grants or other financial assistance from the federal government for, or in aid of, any housing project

within its area of operation," and to "comply with such conditions

... as may be necessary" to facilitate the receipt of federal money.

Ark. Code Ann. § 14-169-225.

51. Additionally, the Supreme Court has explained that 42 U.S.C. §

1983 covers deprivation of liberty interests under color of law, and

it has defined "liberty interest" broadly to include, "not merely

freedom from bodily restraint but also the right of the individual to

...engage in any of the common occupations of life, [to] establish a

home and bring up children, [...] and generally to enjoy those

privileges long recognized...as essential to the orderly pursuit of

happiness by free men." *Board of Regents v. Roth*, 408 U.S. 564, 572

(1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

52. This concept of a liberty interest as applied to housing has been

extended to, *inter alia*, restrictive housing authority roommate

policies that hamper the right to live with relatives. *See Moore v.*

*City of East Cleveland*, 431 U.S. 494, 503 (1977).

### Arkansas's Civil Rights Act

53. The Arkansas Civil Right Act ("ACRA") provides, in pertinent

part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action in circuit court for legal and equitable relief or other proper redress.

Ark. Code Ann. § 16-123-105(a).

54. Among the "certain inherent and inalienable rights" guaranteed by the Arkansas Constitution are "enjoying and defending life and liberty." Ark. Const. Art. 2, § 2.

<u>Little Rock Municipal Ordinances</u>

55. The City of Little Rock, pursuant to Arkansas law, is empowered to pass ordinances that do not conflict with state law. *See* Ark. Code Ann. § 14-55-101.

56. This power generally applies to ordinances that "shall seem necessary to provide for the safety, preserve the health, promote the prosperity, and improve the morals, order, comfort, and convenience of such corporations and the inhabitants thereof." Ark. Code Ann. § 14-55-102.

57. Furthermore, state law gives the City of Little Rock the power to "[r]egulate the erection, construction, reconstruction, alteration, and repair of buildings." Ark. Code Ann. § 14-56-201.

58. Pursuant to this grant of authority from the state, the City of Little Rock adopted the 2012 International Existing Building Code, with Appendices "A," "B," and "C," and Appendices Sections I, II, III, IV and V; and the 2012 International Property Maintenance Code. *See* Little Rock Muni. Code §§ 8-2(a)(9) & (10).

59. The City of Little Rock has further enacted an ordinance requiring, "All buildings or structures, both existing and new, and all parts thereof, shall be maintained in a safe and sanitary condition." Little Rock Muni. Code § 8-333.

60. Additionally, "Every habitable room shall have at least one (1) window or skylight which can easily be opened, or such other device as will adequately ventilate the room." Little Rock Muni. Code § 8-404(b). The City of Little Rock has further decreed that "[r]oofs and overhangs shall be maintained in a safe manner and be structurally sound and have no defects which might admit rain or

cause dampness in the walls or interior portion of the building."
Little Rock Muni. Code § 8-423.

61. Similarly, the City of Little Rock has declared that, "[e]very owner
of a structure containing two (2) or more dwelling units shall be
responsible for maintaining in a clean and sanitary condition the
shared or public area of the dwelling and premises thereof." Little
Rock Muni. Code § 8-407(a).

## GENERAL FACTUAL ALLEGATIONS REGARDING MOLD

62. Moisture in indoor living environments favors mold growth, and
moisture is the primary factor for the growth of indoor mold.

63. Moisture also fosters bacterial growth, triggers the release of air
toxins, and attracts dust mites and cockroaches, which contribute
to household air and dust. Persistently damp conditions degrade
the quality of indoor air.

64. The mold strain *Stachybotrys chartarum* (more commonly known
as "black mold") is known as one of the most toxigenic species of
mold and can produce macrocyclic trichothecenes (mycotoxins)
such as verrucarin J; roridin E; satratoxin F, G, and H; sporidesmin
G; and trichoverrol.

65. *Stachybotrys chartarum* can cause or worsen asthma and asthma-related symptoms, can cause or worsen respiratory problems in susceptible individuals, and is a well-known cause of human toxicosis.

66. The mold strain *Cladosporium* can produce the toxins Cladosporin and emodin, can cause or worsen asthma and asthma-related symptoms, and can cause or worsen respiratory problems in susceptible individuals.

67. The mold strain *Aspergillus* can produce many different toxins, including aflatoxin, a known carcinogen. Additionally, *Aspergillus* can cause or worsen asthma and asthma-related symptoms, can cause or worsen respiratory problems in susceptible individuals and can cause cerebral aspergillosis and pulmonary aspergillosis.

68. The mold strain *Penicillium* can cause or worsen asthma and asthma-related symptoms and can produce the following toxins: penicillic acid, peptide nephrotoxin, viomellein, xanthomegin, xanthocillin X, mycophenolic acid, roquefortine C & D, citrinin, penicillin, cyclopiazonic acid, isofumigaclavine A, penitrem A,

decumbin, patulin citreoviridin, griseofulvin, verruculogen, ochratoxin, chrysogine, and meleagrin.

69. According to the Center for Disease Control, people with asthma are more sensitive to mold, and mold is a well-known asthma trigger.

70. Defendants have known of problems with water leaks stemming from the roof of the Apartments, necessitating observation and infrared scanning, since at least March 3, 2014.

71. Defendants have known of extensive moisture and water leakage in multiple dwelling units with the Apartments since at least April 2014, when the manager of the Apartments, Melanie Y. Lightner, emailed Defendants to inform them of a "major leak in the 6th floor closet" that was "from [the] hot water source and has made its way down to the first floor."

72. On May 22, 2014, an employee of Defendant MHA emailed the roofing-repair company and stated, "Please send over the invoices with description explaining the most recent water leaks."

73. On June 9, 2014, Defendants were informed, "We are still having really bad leaks on the roof here at Powell" and that "one unit...can't [be] lease[d] until the ceiling is repaired."

74. On September 11, 2014, Defendants were told, "water is leaking again" and "water [was] coming from the walls between units 803 & 805."

75. On October 9, 2014, Defendants were told that "the latest rain has shown the leaks are still in the roof."

76. On October 20, 2014, in response to a complaint from a resident in unit 705 of the Apartments regarding mold, the manager of the Apartments stated, "I would like for Atoka to check the air quality on each floor to make sure the intermentant [sic] water leaks have not damaged the air quality."

77. Despite multiple requests, Defendant Forte has not provided documentation of testing of the air quality vis-à-vis mold.

78. On November 4, 2014, Defendants were provided with "Limited Visual Assessment and Mold Testing Results for hallways at Unit 705, 817, 408, 718, & 807" of the Apartments. These results showed:

a. Mold and asbestos in need of remediation in unit 408;

b. Unacceptable levels of airborne mold, indicating an "active mold growth site," in unit 807, as well as visible surface mold, all requiring mold remediation;

c. Untestable air conditions in unit 705, due to an open window, as well as visible mold in need of remediation;

d. Unacceptable levels of airborne mold, indicating an "active mold growth site," in unit 718, as well as visible surface mold, all requiring mold remediation;

e. Untestable air conditions in unit 817, due to an open window, and visible mold in the bathroom of that unit.

79. Also on November 4, the manager of the Apartments sent an email to, *inter alia*, Defendant Forte, explaining that residents in units 408, 718, and 807 would be moved to new units within the Apartments beginning the following day. This email concludes, "My goal is to prevent mass panic so I am limiting my conversation to the people on this email."

80. On November 5, 2014, Defendants moved residents out of units 408, 718, and 807, but did not remove residents from 705 or 817.

81. On November 28, 2014, Defendant Forte emailed, *inter alia*, Little Rock Mayor Mark Stodola, asserting that MHA had "a policy to handle mold[,] but no requests have been made regarding mold." Defendant Forte's statement was false.

82. On January 6, 2015, Defendants were informed of "a significant amount of mold" in the walls on the 8th floor of the Apartments, as well as the high likelihood that there was similar mold in the walls on the 9th floor. Pictures showing extensive mold colonies in the walls of the 8th floor were provided to Defendants by a contractor on this date.

83. On January 7, 2015, Defendants were informed that it was "very important that a roofing contractor is contacted to pinpoint where the roof leak is coming from, so it can be repaired" and that only after "the roof repair is complete, then the Housing Authority can perform the 'put-back' of all the sheetrock removed."

84. On January 9, 2015, Defendant Forte informed Commissioners of Defendant MHA that "[s]taff is [sic] managing information regarding a roof leak and water damage in certain units at Powell Towers" and that Defendant Forte and his staff "are developing a

plan to completely define the situation and create the best next steps to resolve the issues."

85. On January 14, Plaintiff Iverson was informed that she would need to move to a new unit within the Apartments "[d]ue to the need for necessary repairs" to the unit she was then residing in (605), and that she would be notified when a new unit was available.

86. On January 20, Plaintiff Iverson was informed that she would need to move to a new unit (612) the following day.

87. Nearly every resident of the Apartments whose unit ended in 05 or 07 was relocated to a different unit around this same time, with such relocation being due to mold in those apartments due to the ongoing water leak.

88. On March 11, 2015, in response to a letter from State Senator David Johnson, Defendant Forte wrote:

> Concerning mold, we have had several roof leaks during the first quarter of this year at Powell Towers due to faulty contractor work. In order to investigate the possible damage we moved 11 tenants to other vacant units. To date we are finalizing completion of the roof repair and will assess all damage once complete.

89. On March 26, 2015, Defendants were informed that the roof was inspected by a roofing contractor, who cut open a portion of the roof to "expose the cause of the noticeable buckling" and who noticed "water pooling on the roof" and that "insulation foam [inside the roof] was observed to be swelled and full of water."

90. On April 17, 2015, Defendants were informed of the extent of the insufficient quality of the roof as well as the impact the roof had on mold levels in the Apartments, when they were told:

> Toby Harris with All seasons Roofing Co. has submitted a bid to Michael Pieper with Firestone Warranty in the amount of over $200,000.00 to replace the entire roof at Jesse Powell Towers. Michael Pieper with Firestone Warranty is in support of the replacement due to confirmation of substandard work and mold abatement reports.

91. Beginning in September 2014 and continuing through the present, Plaintiffs complained to Defendants about mold in the Apartments.

92. Defendant Forte explicitly told Plaintiffs in August that there was no mold problem in the Apartments, despite his actual knowledge to the contrary.

93. When asked why Plaintiffs were moved from their units in January if there was no mold, Defendant Forte stated that it was to make

sure that there was no mold in those areas. Defendant Forte had previously stated, when asked the same question in June, that it was because of a roof leak. Neither of these statements was truthful.

94. Defendant Forte also said that "the report we received in January showed there was no mold."

95. Despite repeated requests for reports showing a lack of mold in January, Defendant Forte has not provided any such documentation.

96. On September 18, Defendants had the company responsible for mold remediation in the Apartments to give a presentation at the monthly board meeting regarding the work that had been done.

97. On October 15, Defendant Forte said that no follow-up testing had been done since mold and asbestos remediation had been performed, despite his earlier statement about a "report we received in January."

98. On October 21, employees of Defendants were seen working around a garbage chute on the 6th floor across from Plaintiff Iverson's unit. One of the employees indicated to Plaintiff Iverson

that the chute had extensive mold inside and outside, which Ms.
Iverson confirmed visually.

99. According to the employee performing the work for Defendants,
the "treatment" being used in that apartment was simply to paint
over the mold.

100. Recent inspections of multiple units and floors of the
Apartments show the presence of mold as of the date of filing of
this Complaint, including mold in Plaintiff Iverson's unit.

## GENERAL FACUTAL ALLEGATIONS REGARDING ELEVATORS

101. Beginning in late 2014, Defendants began to solicit bids for
"elevator modernization" at the Apartments, with a requirement
in the request for proposals that the elevators must comply with
the ADA.

102. On or about January 7, 2015, Defendants awarded a contract for
the elevator modernization at the Apartments to CJS Enterprises,
Inc., in the amount of $490,125.00, with the work to be completed
by September 16, 2015.

103. Defendants' work orders for 2015 regarding the elevators at the
Apartments show:

a. April 7: "Elevator not working for 2 days."

b. August 15: "Elevator stuck on 8th floor w/ someone in it."

c. August 16: "Elevator stuck again on 7th floor."

d. August 29: "Elevator is broke down."

e. August 29: "Elevators are down."

f. October 15: "The elevator has been out – are you coming to fix this? – Can't get to her apartment."

104.   Additionally, on June 25, a complaint was reported to Defendants that neither of the elevators in the Apartments was working.

105.   Since at least early August, one or both elevators in the Apartments has been constantly inoperable.

106.   On October 27, the contractor overseeing the elevator modernization was told that neither elevator was working, and he wrote in response, "This is the first I have heard of the elevators not working."

## GENERAL FACTS RELEVANT TO ALL CLAIMS

107.   Plaintiff Iverson moved into the Apartments in June of 2014, and Plaintiff Eans moved into the Apartments in September of 2014.

108.   Plaintiff Iverson suffers from asthma, which substantially limits her major life activities, including breathing and respiration, a major bodily function.

109.   Plaintiff Eans suffers from asthma, which substantially limits her major life activities, including breathing and respiration, a major bodily function.

110.   Beginning almost immediately upon moving into the Apartments, Plaintiffs began experiencing respiratory problems associated with exacerbation of asthma symptoms. Plaintiff Iverson's doctor placed her on a prescription inhaler to combat the respiratory problems, while Plaintiff Eans was hospitalized three separate times with severe respiratory problems.

111.   Plaintiff Eans' physician stated that her recurring symptoms were likely the result of mold or similar organic material in the air in her residence.

112.   Plaintiff Iverson has been diagnosed with post-traumatic stress disorder (PTSD) stemming from her constant worrying about the health effects of mold within the Apartments.

113.   Due to asthma exacerbated by the air quality in the Apartments, neither Plaintiff is able to access her unit easily when the elevators are not functioning.

114.   Due to her cerebral palsy, Plaintiff Eans was unable to access her unit in the Apartments when the elevators were not functioning.

115.   In September, Plaintiff Eans was told, if she was unhappy with the conditions of the Apartments, that she should leave. Defendants, through their employees, constructively evicted Plaintiff Eans by making it clear that no work would be done to rectify the unsafe conditions about which Plaintiff Eans was complaining. Plaintiff Eans had no choice, under those circumstances, but to leave to protect her health and well-being.

## CLAIM 1 – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

116.    Defendant MHA is a public entity for the purposes of 42 U.S.C. § 12131(1)(B).

117.    Plaintiffs are each an "individual with a disability" as defined in 42 U.S.C. § 12102(1)(A) and 28 C.F.R. § 35.104 and a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

118.    In failing to provide apartments free of mold and moisture and failing to reasonably modify its policies, practices, and procedures to provide an apartment free of mold and moisture, Defendant MHA has:

    a.  Failed to afford Plaintiffs an opportunity to participate in and benefit from MHA housing;

    b.  Provided a benefit that is not as effective in affording an equal opportunity to obtain the same result;

    c.  Failed to provide reasonable accommodations and modifications necessary to avoid discrimination;

d. Used methods of program administration that have a discriminatory effect;

e. Otherwise limited Plaintiffs in the enjoyment of rights, privileges, advantages, and opportunities provided to others;

f. Otherwise discriminated against Plaintiffs on the basis of disability, in violation of the ADA and its implementing regulations. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.130(a), (b)(1)(ii) through (b)(1)(iv), (b)(3), and (b)(7).

119.   In failing to provide properly working elevators and failing to reasonably modify its policies, practices, and procedures to provide properly working elevators, Defendant MHA has:

a. Failed to afford Plaintiffs an opportunity to participate in and benefit from MHA housing;

b. Provided a benefit that is not as effective in affording an equal opportunity to obtain the same result;

c. Failed to provide reasonable accommodations and modifications necessary to avoid discrimination;

d. Used methods of program administration that have a discriminatory effect;

e. Otherwise limited Plaintiffs in the enjoyment of rights, privileges, advantages, and opportunities provided to others;

f. Otherwise discriminated against Plaintiffs on the basis of disability, in violation of the ADA and its implementing regulations. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.130(a), (b)(1)(ii) through (b)(1)(iv), (b)(3), and (b)(7).

## CLAIM 2 – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

120. Defendant MHA receives federal funding from HUD.

121. Each of the Plaintiffs is an "otherwise qualified individual with a disability" under 29 U.S.C. § 794(a).

122. Each of the Plaintiffs is an "individual with a disability" under 29 U.S.C. § 705(20)(B), an "individual with handicaps" under 24 C.F.R. § 8.3, and a "qualified individual with handicaps" under 24 C.F.R. § 8.4(b)(1).

123. In failing to provide apartments free of mold and moisture and failing to reasonably modify its policies, practices, and procedures to provide an apartment free of mold and moisture, Defendant MHA has:

a. Failed to afford Plaintiffs an opportunity to participate in and benefit from MHA housing;

b. Provided a benefit that is not as effective in affording an equal opportunity to obtain the same result;

c. Failed to provide reasonable accommodations and modifications necessary to avoid discrimination;

d. Used methods of program administration that have a discriminatory effect;

e. Otherwise limited Plaintiffs in the enjoyment of rights, privileges, advantages, and opportunities provided to others;

f. Otherwise discriminated against Plaintiffs on the basis of disability, in violation of Section 504 of the Rehabilitation Act and its implementing regulations. 29 U.S.C. § 794(a); 24 C.F.R. §§ 8.4(b)(1)(ii) through (b)(1)(iv), (b)(1)(viii), (b)(2), and (b)(4)(i) through (b)(4)(ii).

124.   In failing to provide properly working elevators and failing to reasonably modify its policies, practices, and procedures to provide properly working elevators, Defendant MHA has:

a. Failed to afford Plaintiffs an opportunity to participate in and benefit from MHA housing;

b. Provided a benefit that is not as effective in affording an equal opportunity to obtain the same result;

c. Failed to provide reasonable accommodations and modifications necessary to avoid discrimination;

d. Used methods of program administration that have a discriminatory effect;

e. Otherwise limited Plaintiffs in the enjoyment of rights, privileges, advantages, and opportunities provided to others;

f. Otherwise discriminated against Plaintiffs on the basis of disability, in violation of Section 504 of the Rehabilitation Act and its implementing regulations. 29 U.S.C. § 794(a); 24 C.F.R. §§ 8.4(b)(1)(ii) through (b)(1)(iv), (b)(1)(viii), (b)(2), and (b)(4)(i) through (b)(4)(ii).

## CLAIM 3 – VIOLATION OF THE FAIR HOUSING AMENDMENTS ACT

125.   Each of the Plaintiffs has a "handicap" under 42 U.S.C. § 3604(f)(2) and 24 C.F.R. § 100.201.

126. In failing to provide apartments free of mold and moisture, Defendant MHA has:

   a. Discriminated in the rental of dwellings on the basis of handicap;

   b. Discriminated in the provision of services and facilities in connection with dwellings on the basis of handicap;

   c. Refused to make reasonable accommodations in rules, policies, practices, or services to individuals with handicaps when necessary to afford Plaintiffs with an opportunity to use and enjoy MHA housing, in violation of the FHAA and its implementing regulations. 42 U.S.C. §§ 3604(f)(1)(A) through (f)(1)(B), (f)(2)(A) through (f)(2)(B), and (f)(3)(B); 24 C.F.R.

127. In failing to provide properly working elevators, Defendant MHA has:

   a. Discriminated in the rental of dwellings on the basis of handicap;

   b. Discriminated in the provision of services and facilities in connection with dwellings on the basis of handicap; and

c. Refused to make reasonable accommodations in rules, policies, practices, or services to individuals with handicaps when necessary to afford Plaintiffs with an opportunity to use and enjoy MHA housing, in violation of the FHAA and its implementing regulations. 42 U.S.C. §§ 3604(f)(1)(A) through (f)(1)(B), (f)(2)(A) through (f)(2)(B), and (f)(3)(B); 24 C.F.R.

### CLAIM 4 – VIOLATION OF 42 U.S.C. § 1983

128.   Defendant MHA and Defendant Forte operate under color of law granted to them by local, state, and federal laws, policies, and regulations.

129.   As a binding condition for receiving federal funds through HUD, Defendant MHA must provide housing that has proper ventilation and is free of mold.

130.   The conditions placed on the receipt of HUD funding creates a right in the individuals living in the Apartments to be provided housing that has proper ventilation and is free of mold.

131.   By failing to provide Plaintiffs with apartments that are free of mold, Defendant MHA, acting under color of law, has deprived

Plaintiffs of the right to mold-free housing, in violation of 42 U.S.C. § 1983.

132.    By failing to provide Plaintiffs with apartments that are free of mold, Defendant MHA caused Plaintiffs to be subjected to deprivation of their liberty interests in public-housing living conditions that are free from known, unreasonable health hazards, in violation of 42 U.S.C. § 1983.

133.    By telling Plaintiff Eans to leave if she was unhappy with the conditions at the Apartments, despite the fact that Eans qualified for public-housing funding and had a right to receive public housing because of that funding, Eans was forced to leave in protection of her own health, Defendant MHA deprived Plaintiff Eans of rights and privileges guaranteed to her under the law, in violation of 42 U.S.C. § 1983.

134.    By intentionally misleading Plaintiffs regarding the presence of mold in the Apartments, when he knew for a fact that mold was present, Defendant Forte caused Plaintiffs to be subjected to deprivation of their liberty interests in good health, inasmuch as Forte's false representations were designed to keep Plaintiffs in the

Apartments, irrespective of the adverse impact that continued residency would and did have on Plaintiffs' health, in violation of 42 U.S.C. § 1983.

## CLAIM 4 – VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT

135.   Defendant MHA and Defendant Forte operate under color of law granted to them by local, state, and federal laws, policies, and regulations.

136.   By failing to provide Plaintiffs with apartments that were free of mold, Defendant MHA deprived Plaintiffs of their inherent and inalienable right to enjoy life, as guaranteed by the Arkansas Constitution, in violation of the Arkansas Civil Rights Act. *See* Ark. Const. Art. 2, § 2.

137.   By intentionally misleading Plaintiffs regarding the presence of mold in the Apartments, when he knew for a fact that mold was present, Defendant Forte caused Plaintiffs to be subjected to deprivation of their liberty interests in good health, inasmuch as Forte's false representations were designed to keep Plaintiffs in the Apartments, irrespective of the adverse impact that continued

residency would and did have on Plaintiffs' health, in violation of
the Arkansas Civil Rights Act.

## CLAIM 5 – BREACH OF IMPLIED WARRANTY OF HABITABILITY

138.   While there was no implied warranty of habitability at common
law, such an implied warranty of habitability can be created where
legislation and administrative rules impose certain duties on a
property owner with respect to the condition of his premises and
indicate a policy judgment that it is socially and politically desirable
to impose these duties on a property owner.[1] *See Pines v. Perssion*,
14 Wis. 2d 590, 111 N.W.2d 409 (1961) (cited with approval in
*Lindsey v. Normet*, 405 U.S. 56 (1972)).

139.   The City of Little Rock has evinced a policy judgment that it is
socially and politically desirable to impose on property owners the
duties of ensuring that:

---

[1] As the *Pines* court accurately stated, "The need and social desirability of
adequate housing for people in this era of rapid population increases is too
important to be rebuffed by that obnoxious legal cliche, *caveat emptor*." 14
Wis. 2d at 596, 111 N.W.2d at 412. "Permitting landlords to rent 'tumble-
down' houses is at least a contributing cause of such problems as urban
blight, juvenile delinquency, and high property taxes for conscientious
landowners." *Id.*

a. "Every habitable room shall have at least one (1) window or skylight which can easily be opened, or such other device as will adequately ventilate the room." Little Rock Muni. Code § 8-404(b);

b. "Roofs and overhangs shall be maintained in a safe manner and be structurally sound and have no defects which might admit rain or cause dampness in the walls or interior portion of the building." Little Rock Muni. Code § 8-423;

c. "Every owner of a structure containing two (2) or more dwelling units shall be responsible for maintaining in a clean and sanitary condition the shared or public area of the dwelling and premises thereof." Little Rock Muni. Code § 8-407(a).

140.   In so doing, the City of Little Rock has created an implied warranty of habitability for rental property within the city limits.

141.   Similarly, with respect to public housing under HUD funding, the federal government has determined that it is socially and politically desirable to impose on property owners the duties of

ensuring that apartments are decent, safe, sanitary, in good repair, properly ventilated, and free from mold. *See* 24 C.F.R. § 5.703.

142.   Accordingly, the federal government has created an implied warranty of habitability within public housing that receives HUD funds.

143.   In such situations, "[t]o follow the old rule of no implied warranty of habitability in leases would...be inconsistent with the current legislative policy concerning housing standards." *See Pines*, 14 Wis. 2d 590, 111 N.W.2d 409.

144.   Defendant MHA had actual and constructive notice of the presence of mold and, therefore, actual and constructive notice of the existence of conditions that constituted breach of the implied warranty of habitability, and they did not take adequate steps to mitigate the breach or prevent damages therefrom.

145.   By not providing Plaintiffs with apartments and adjacent common areas that were adequately ventilated and free from mold, Defendant MHA breached the implied warranty of habitability as created by the City of Little Rock and the federal government.

146.   Plaintiffs have suffered actual and consequential damages as a result of this breach, and Defendant MHA's actions are the legal and proximate cause of those damages.

## CLAIM 6 – NEGLIGENCE

147.   Defendant MHA owed a duty to Plaintiffs to provide them with housing that was free of mold, to promptly and adequately locate and abate any moldy conditions that were know or should have been known, to provide Plaintiffs with access to properly working elevators so that Plaintiffs could access their apartments, and to avoid exposing Plaintiffs to any unreasonably unsafe conditions.

148.   Defendant MHA breached these duties by failing to provide Plaintiffs with apartments that were free from mold, by failing to adequately locate and abate mold within the Apartments, by failing to keep properly working elevators in service at the Apartments, and by exposing Plaintiffs to unreasonably unsafe conditions in the form of mold that can exacerbate asthmatic conditions and can generate toxins that are harmful to humans.

149.   Plaintiffs suffered damages as a result of Defendant MHAs breaches of these duties, including medical costs, worsening

asthma, post-traumatic stress disorder, loss of enjoyment of life, and mental anguish.

150.   Defendant MHA's breaches of duties owed to Plaintiffs were the legal and proximate cause of Plaintiffs' damages.

### PRAYER FOR RELIEF

151.   Plaintiffs demand a jury trial in this matter.

152.   Plaintiffs pray that this Court will:

    a.   Grant declaratory relief to Plaintiffs based on Defendants' violations of the ADA, Section 504, and the FHAA;

    b.   Award them actual, punitive, consequential, and hedonic damages in an amount to be determined by a jury based on Defendants' violations of 42 U.S.C. § 1983 and the Arkansas Civil Rights Act;

    c.   Award them actual, punitive, consequential, and hedonic damages in an amount to be determined by a jury based on Defendant MHA's breach of the implied warranty of habitability;

    d.  Award them actual, punitive, consequential, and hedonic

        damages in an amount to be determined by a jury based on

        Defendant MHA's negligence;

    e.  Award attorneys' fees and costs as permitted by statute in

        this matter; and

    f.  Grant them any other relief to which they may be entitled in

        law or in equity.

WHEREFORE the Plaintiffs, Bonita Iverson and April Eans, pray that this Court will grant the relief sought herein.

Respectfully submitted,

/s/ Matthew D. Campbell
Ark. Bar No. 2009032
Pinnacle Law Firm, PLLC
P.O. Box 7469
Little Rock, AR 72217
P: (501) 396-9246
F: (501) 421-0189
matt@pinnaclelawfirm.com
*Attorney for Plaintiffs*